# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

**UNITED STATES OF AMERICA**

**vs.**                                            **Case No: 3:16-cr-61-BJD-MCR**

**JUSTIN G. PENNINGTON**

_____/

## *CORRECTED*
## DEFENDANT PENNINGTON'S SENTENCING MITIGATION REPORT

Comes Now WILLIAM MALLORY KENT, as sentencing counsel for the Defendant, Justin G. Pennington ("Pennington"), and files the following sentencing mitigation report to aid the Court in imposition of sentence.

## Introduction

Title 18 U.S.C. § 3553 mandates that the court shall impose a sentence that is sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing, and in determining such sentence, the court shall consider the nature and circumstances of the offense, and the history and characteristics of the defendant. Pennington respectfully requests that the Court consider the following information in mitigation of his sentence:

## Current Posture of the Defendant

*The Defendant's Response to His Status*.  On April 26, 2017, Pennington was found guilty of Counts One through Ten of the Indictment following a jury trial

before United States District Judge Brian J. Davis. Despite the guilty verdict, Pennington remains respectful of the law, the court, and the function of law enforcement officers in the community. According to the presentence report, Pennington made an initial appearance on May 18, 2016, pursuant to a notice to appear, and was released on a personal recognizance bond with pretrial supervision. Pennington has kept faith with the court's order, and has fully complied with all of the terms and conditions of his release. As of the date of sentencing, Pennington will have remained at liberty for approximately 18 months without incident.

*Family's Response to Defendant's Status*. As might be expected, Pennington's family is heartbroken over the jury's verdict. As law-abiding, respected members of the community, their faith in the legal system, and their knowledge of Pennington, caused them to anticipate a more favorable outcome from the trial. In short, they are devastated. The day after the trial, the family was deluged by the press with negative publicity. Pennington and his spouse, with two very young children, were forced into survival mode. Due to the reversal of fortune involved in the case, the couple became crippled with worry about how they would pay their mortgage to keep a roof over their children's heads.

In order to soften the psychological and financial impact on the children, Pennington's mother-in-law and her husband have been compelled to relocate from

Arizona, and are living at the Pennington home. Although a freelance photographer, Pennington's spouse has been a homemaker since 2009. The presence of the in-laws in the home has become necessary for the financial support, and supplemental care of the children.

*Collateral Consequences of the Offense.* In addition to the usual consequences of incurring a felony conviction, such as the loss of certain civil rights, and the privilege of voting, etc., Pennington has incurred the blowback from the publicity of the jury verdict as it relates to his ability to stabilize his employment situation. In the aftermath of the conviction, Pennington is now a consultant in the information technology industry. As a consequence of the negative publicity on industry websites, Pennington lost several leads/contracts for future business. In addition, his wife's photo business prospects have dwindled.

Prior to the offense conduct coming to the attention of federal law enforcement, Pennington had been engaging in efforts at dispute resolution with the owners of The Wholesale House since March 2014. During that time, several unfortunate events befell Pennington and his family that may have long term emotional implications. At some point, during the efforts of negotiations, Pennington was shadowed by an employee of The Wholesale House, and unsolicited calls were made to his wife and parents. Closely related to these events, in July 2014, Pennington's wife was

pregnant, and undergoing extreme duress associated with the company's surveillance efforts. Unfortunately, on July 15, 2014, Ms. Pennington suffered a miscarriage, and the loss of the couple's child.

In July 2017, Ms. Pennington began suffering from acute health problems mimicking a heart attack. She was prescribed medications for a cardiac arrest. Consequently, however, she was determined to be suffering from panic attacks. Ms. Pennington endured serious side effects from this miscalculation of her health crisis.

Finally, in October 2017, Pennington's wife was fired from her job at a local magazine in response to a letter to the editor from an unknown source, criticizing the company's decision to hire her, based on the publicity related to Pennington's conviction. She has no recourse to the decision of management to terminate her employment.

## The Nature and Circumstances of the Offense

Factors in Mitigation of the Offense. There are several factors in mitigation of the offense that may be pertinent to the provisions of USSG §1B1.4 (Information to Be Used in Imposing Sentence; Selecting a Point within the Guideline Range or Departing from the Guidelines). First, at the time of the offense, Pennington had no history of criminal convictions, zero criminal history points, and has a designation of criminal history category I. Although the sentencing commission has prohibited

downward departures from criminal history category I, there is an implicit acknowledgement that there may be certain cases where anonymous mitigating factors exist beyond the designation of criminal history category I. In any event, Pennington was a true first-time offender at the time of the offense, and poses the lowest probability for recidivism.

Second, prior to his involvement with Three Kings, Pennington had no experience or educational qualifications in the management or operation of a business enterprise. Although, he has a degree in management information systems (i.e., information technology, "IT"), Pennington transitioned from the position of director of IT, to assisting Marcelene Keesbury and Charles French in the operation of Three Kings, a position for which he was not professionally prepared. Pennington had no previous professional training in entrepreneurship, economics, or accounting. At the beginning of the offense conduct, Pennington was 24 years of age, and scarcely three years beyond graduation from college.

Pennington had no practical work experience before his employment at The Wholesale House. By contrast, the other participants, Ms. Keesbury, and Mr. French, are currently ages 54 and 50, respectively. Each had worked for The Wholesale House for decades before Pennington came into the employ of the company. According to the presentence report, Ms. Keesbury began with The Wholesale House

in 1988, and was promoted to the position of president in 1998. Likewise, Mr. French began his employment in 1991, and was promoted to the position of vice president in 1997. Historically, Pennington and Mr. French shared a mentoring relationship, with Mr. French serving as both a mentor and a friend.

Third, in June 2009, Pennington's wife was laid off from her job, which was instrumental in her ability to pay for her college education. This development occurred just before the inception of the concept for Three Kings. In November 2010, Ms. Pennington became pregnant with the couple's first child. By this time, the couple had invested all of their savings to pay for Ms. Pennington's education at the Indiana Institute of Technology. In connection with Pennington's employment with The Wholesale House, the family lived in Hicksville, Ohio (pop. 3,000), and Ft. Wayne, Indiana. Due to cultural nuances in those communities, the couple was determined to return to Florida, which Pennington's employment with Three Kings, afforded them the opportunity.

## History and Characteristics of the Defendant

The following information regarding the defendant's history and characteristics is offered as a supplement to the thorough presentence investigation and report conducted by the United States Probation Office:

*Parents/Nuclear Family Circumstances*. As reflected in the presentence report,

Pennington's father, Donald Lee Pennington, is retired from the United States Air Force. In post-retirement, he works as a chauffeur. Donald Pennington, age 71, currently suffers from several serious medical conditions. On March 2017, he was diagnosed with malignant melanoma. He also suffers from diabetes. Pennington has undergone two major surgeries in connection with his treatment for cancer. Although he is being successfully treated, his ultimate prognosis is uncertain. Both parents were interviewed in contemplation of this report. Pennington rendered the following statement in reference to his son:

> I was age 40 when Justin was born, and I always said I wouldn't spank him. As it turned out, I never had to. Due to Justin's knee problems, which limited his ability to walk in elementary school, Justin spent equal time with adults as with children his own age. Despite the challenging circumstances, Justin always had a manner about him that figuratively said, "It's all good." He started working with Steve [Height] at age 16, and due to his limited relations with his peers, Justin quickly became more trusting of adults, than maybe he should have been at that age. Because of his talent with computers, he has always been generous with his time in helping older persons with technology problems. He was my "tech guy," and that to many others. Even when he was away at college, Justin would fix computer applications remotely, without charging for his services. He built a website for Steve while in college. Based on my understanding of things, I never thought he was doing anything in violation of the law. If so, I would have advised him against it. I just sense that his propensity for easily trusting others is very closely connected with the case against him. Justin has never harmed or defrauded anyone in his life. I do not believe he would pose a threat to anyone in the future.

Pennington's mother, Mary Beth Pennington, echoed the comments of her husband:

Even as an only child, Justin has always shown kindness to others – just simply, a kind soul. His attitude was to do things for others first. He has the biggest heart. Justin was not able to participate in physical education in elementary school, and thus spent his time helping the school librarians. He is no different today than what he's always been. He is the best father, and a very hard worker. Justin never complains, and always maintains a positive attitude. Outside of the current case, there is no one who has anything bad to say about him. I think his weakness is that he is too trusting in others, and that is really why he is in the trouble that he's in. Justin is always the first one to be there to help others.

*Circumstances During Pennington's Employment with The Wholesale House.*

Pennington is married to his high school sweetheart, Kim Pennington. Ms. Pennington, age 30, has known her husband since their teens. When Pennington left home to attend Florida State University, in Tallahassee, Florida, Kim subsequently moved to Tallahassee to be there with him. Ms. Pennington offered the following comments about her husband:

When I met Justin, I was a crazy teen. He made me realize that I was on a bad path in life. From there, we became friends. He notices when others are in need, and is willing to help guide people when they need help. Justin is the kind of person that will give you the shirt off his back. He has always been a hard worker. He worked almost full time while in high school. Family is number one with him. Justin is incredibly loving and kind. When our daughter was born, I could see the love he had for her – he was 100 percent involved with everything, from diaper-changing to dance parties. Justin was taught respect from his father from the beginning. He is my best friend, and I totally support him.

In August 2007, following Pennington's graduation from college, he accepted

the job as Director of Information Technology with The Wholesale House. The young couple moved to Hicksville, Ohio, where Pennington when to work for the company. On March 1, 2008, the couple married in Ft. Wayne, Indiana. The community of Hicksville was very small, and culturally isolated. During Pennington's employment with The Wholesale House, he and his wife maintained very close personal relationships with Marcelene Keesbury and Charles French. The Penningtons regarded Ms. Keesbury and Mr. French as their best friends. The couples spent much time together, socially, as well as professionally. Pennington viewed Mr. French as a role model and mentor, and based his experiences at The Wholesale House on the foundation of that relationship. Pennington was attracted to Mr. French's passion for business.

In November 2010, Ms. Pennington became pregnant, and on July 29, 2011, gave birth to their first child, Brooklyn Elsie Pennington, currently age six. It was in 2010, that Ms. Keesbury, Mr. French, and Pennington formed the company, Three Kings, which is the subject of the conviction against Pennington. The close friendship between Mr. French and Pennington continued throughout their years with Three Kings. According to Kim Pennington, during this time, she believed that Pennington felt a strong obligation to please Mr. French and Ms. Keesbury. She indicated that as she recalls, Mr. French floated the idea of them leaving The Wholesale House, and

launch Three Kings, to Ms. Keesbury and Pennington, while they were all aboard a pleasure boat. She further recalls Mr. French say, "Why don't we start an online company selling car audio equipment." Ms. Pennington also stated that she remembers Pennington expressing concern about insuring that The Wholesale House did not suffer by the creation of Three Kings.

In 2012, Pennington moved his family Nocatee, in Ponte Vedra, Florida, where he continued working with Three Kings. On July 15, 2014, Ms. Pennington suffered a miscarriage, and the loss of the couple's child. In 2014, Ms. Pennington began suffering from episodes of panic attacks. In 2015, she would be diagnosed with severe anxiety.

On April 12, 2015, Ms. Pennington gave birth to Justin Gregory Pennington II, currently two years of age. In the middle of 2017, in response to their family doctor's concern regarding Justin's speech development, he was referred by the child's pediatrician to be evaluated by Brooks Rehabilitation. The clinical impression (therapy diagnosis) revealed that the "child presents delay in expressive language skills, impacting his functional communications with family and peers." This diagnosis is related to the impairment of "expressive language delay." According to the treatment goals for Justin, the medical team established a long-term goal characterized by "the family caregiver will be independent with advanced home

exercise program as recommended by the clinician." The initial goal due date was set at 24 weeks of rehabilitation. The report concludes by stating that "Delivery of skilled speech therapy interventions is medically necessary for this patient to achieve optimal functional outcomes."

*Pennington's Health*. As acknowledged in the presentence report, Pennington has a chronic recurrence of subluxing patella of his knees, a condition that has been both perennial, and painful. On February 27, 2017, Pennington was advised by his physician that surgery was necessary to stabilize the functioning, and relieve the pain in his left knee. Although Pennington agreed with his doctor's assessment and recommendation for surgery, the operation was not a practical possibility at the time of the diagnosis. Pennington's doctor acknowledged his inability to have the surgery performed at that time, but admonished Pennington on the medical implications for prolonging the inevitable surgery.

*Post Offense Rehabilitation*. Since August 2017, Pennington has been performing volunteer community service work at the Beaver Street Enterprise Center in Jacksonville, Florida. Using his expertise in computer and information technology, Pennington provides consulting and advice to the enterprise, inuring to the benefit of numerous small or disadvantaged businesses. Upon the inception of his service, Pennington made a five year commitment to the organization. He contributes 20

hours per week. The management is fully aware of Pennington's pending sentencing, and is appreciative of his decision to offer his services to the organization.

The founding chairman and Chief Executive Officer of Fresh Ministries, The Rev. Dr. Robert V. Lee, has submitted a letter for the court's consideration, which has been appended to this report. Dr. Lee describes in detail the impact that Pennington's volunteer work has had on the companies benefitted by his technical expertise. Dr. Lee also specifically offered his qualified opinion on Pennington's positive reflections on some of his past unwise choices, and his determination to use his current legal situation as motivation to serve others. Likewise, Theresa Johnson, the executive director of the Beaver Street Enterprise Center was inspired to submit a letter to the court on behalf of Pennington. She confirms the level of trust that the organization has in Pennington, and endorses his promise to fulfill a five-year commitment to provide expert technical assistance to organization. Ms. Johnson has outlined a list of projects that Pennington has undertaken since he arrived at the organization. She advised that if Pennington is allowed to fulfill his commitment, he can "help hundreds of small business owners create jobs and prosperity for their employees, customer, and families in the core-city Jacksonville."

## Community Support

Pennington continues to receive the unwavering support and encouragement

from his wife, parents, in-laws, and other extended family members. As referenced earlier, Pennington's mother-in-law, and her husband, have personally moved from Arizona to Jacksonville in an effort to provide assistance to Pennington and his family. They have been providing financial support in an effort to counterbalance the family's diminished financial condition. All of his relatives are respected, law-abiding citizens. As such, they are in a position to assist and encourage Pennington to comply with any and all conditions of the court, should he receive a sentence that would permit him to remain in the community. Outside of the identified victims in this case, there is no information to suggest that Pennington has had any prior conflicts in any of the communities in which has lived.

Additionally, in the aftermath of his conviction in this case, Pennington continues to enjoy tremendous support from wider and varied sectors of the community. Several persons in the general community who are knowledgeable of Pennington's character have written letters of support on his behalf. They are appended to this report for the court's further consideration. The collective theme of their sentiments is that Pennington is polite, hard-working, and generous. None of the letter writers indicate that they have seen anything in Pennington's background that presents an ongoing threat to any part of the community.

### Issues of Therapeutic Concern

As reflected in the presentence report, Pennington acknowledges that he has been depressed since the aftermath of the trial. The brunt of his depression is based on his concern for the fate of his wife and children, if the court imposes a sentence of imprisonment. Pennington desires to bring about an improvement to his emotional health, and is amenable to a mental health evaluation, and any recommended treatment while on supervision.

From a medical perspective, Pennington has had a recent recurrence of the condition of a subluxing patella, which required prior surgery. The condition is painful, and requires surgery that Pennington has been forced to postpone pending the outcome of his sentencing.

### Factors Militating in Favor of Downward Departure or Variance

According to USSG §2B1.1, comment. (n. (20(C)) Downward Departure Consideration, "[t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." The very nature of the loss table under § 2B1.1 is to overstate the seriousness of financial loss offenses.

In addition to the provisions of USSG §2B1.1, USSG §5K2.0(a)(4) states that [a]n offender characteristic, or other circumstance, identified in Chapter Five, Part H

(Offender Characteristics), or elsewhere in the guidelines, as not ordinarily relevant in determining whether a departure is warranted, may be relevant to this determination, only if such offender characteristic or other circumstance is present to an exceptional degree. There is a combination of two or more offender characteristics, or other circumstances, that distinguish this case from the typical cases contemplated by the Sentencing Commission, that may suggest a downward departure from the advisory guideline sentencing range. USSG §5K2.0(c).

First, according to USSG §5H1.6. Family Ties and Responsibilities (Policy Statement), a downward departure may be warranted in cases based on criteria such as loss of caretaking or financial support, where the loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. In this case, there are two bases for consideration of this factor. Pennington has a wife and two small children that are not only dependent on his financial support, but also his indispensable presence in the caring for his two-year-old son, who has been diagnosed with expressive language delay. According to the medical professionals working with the child, continued family support is necessary for attaining the goal of a long term favorable prognosis.

In addition to the circumstances with Pennington's son, his father's medical condition may augment the factor regarding family ties and responsibilities. On

March 6, 2017, his father, age 71, was diagnosed with malignant melanoma. Following a subsequent biopsy and surgery, the prognosis is guarded. According to his physician, the elder Pennington has a 50 percent chance for the recurrence of cancer. Accordingly, Pennington seeks to provide moral support for his father as he continues his treatments. Although family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted, they are not forbidden by the guidelines, and, in this case may warrant further consideration of a variance under an analysis of 18 U.S.C. § 3553(a).

Second, in accordance with USSG §5H1.4. Physical Condition (Policy Statement), physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree, and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

In this case, the defendant's physical condition, although not seriously infirm, is impaired to the extent that he has a chronic recurrence of subluxing patella of his knees, a condition that plagued Pennington since childhood. This condition requires

imminent surgery, and extensive rehabilitation, that would be both more cost-effective to the government, and therapeutically beneficial to Pennington, if performed by his physician, by contrast to the treatment in the Federal Bureau of Prisons. Collectively, these factors may constitute a circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described.

## Further Factors Militating in Favor of a Variance from the Advisory Guidelines System

The history and characteristics of the defendant, as evidenced by a reiteration of the facts and circumstances in support of a downward departure, reflecting the defendant's unique personal history, and his dedication to the community, militate in favor of a sentence outside of the advisory guidelines system. The importance of these circumstances are reinforced by the defendant's status as a true first time offender who has been convicted of a nonviolent offense, where there is no identifiable victim or restitution applicable. Further, it is anticipated that a sentence that is at variance with the advisory guidelines system is sufficient to satisfy all of the purposes of 18 U.S.C. 3553(a)(2)(A)(1)-(7).

In addition to other § 3553 factors, there are United States Sentencing

Commission policy statements. The guideline at §2B1.1 has received much historical criticism for being overly punitive in its application to cases perceived as high-loss cases. This criticism led the United States Sentencing Commission to adopt amendments to §2B1.1 during the 2015 amendment cycle. While applauding the Commission's attempt at bringing some measure of balance to sentences in fraud cases, distinguished law professor, and ardent student of the history of the fraud guidelines, Frank O. Bowman III, posited the following view:

> The Commission is surely correct to revisit Section 2B1.1. At least as to high-loss defendants, it now does not function as a meaningful tool for sentencing judges. While the Commission recognizes this problem, its proposed remedies will not solve it.

Despite the fact that the amendments was not agreed upon by the Commission, the court may find that due to underlying issues accompanying the overall utility of the guideline, the court is at liberty to absorb the discussion into its § 3553 analysis regarding the need to reconcile the especially onerous fraud guideline calculations with the individual offender characteristics.

### Pennington's Status as "True" First-Time Offender

The Sentencing Reform Act of 1984 requires that the Guidelines reflect the appropriateness of imposing a sentence other than imprisonment for the first-time offender who has not been convicted of a crime of violence, or otherwise serious

offense. Recently, the Sentencing Commission completed an eight-year study on the recidivism rates of federal offenders. Among the findings was the fact that the recidivism rate for offenders in criminal history category I was 33.8 percent. Additionally, the re-conviction rate for that group was only 19.9 percent. The Commission also found that when controlling for educational level, offenders who were college graduates had a rearrest rate of just about 19 percent. Pennington is both a true first-time offender (with zero criminal history points), as well as a college graduate.

The report also indicated that of all the major offense categories, fraud offenders were least likely to be rearrested at a rate of 34.2 percent. By contrast, firearms offenders, were the most likely to be rearrested, at a rate of 68.3 percent. Not only is Pennington a true first-time offender, he has never been arrested, nor has he had any prior contact with law enforcement on any level of jurisdiction. Consequently, any consideration that the court may have regarding several of the factors listed at 18 U.S.C. § 3553(a)(2), such as the need to protect the public from further crimes, and to afford adequate deterrence, is very likely sated by the characteristics of Pennington's status as a true first-time offender.

### Alternatives to Incarceration

As reflected in the presentence report, the statutory provisions do not preclude

a sentence of probation.  There are other options that the court can consider in order to fashion a sentence that satisfies the statutory purposes of sentencing. According to 28 U.S.C. 994(g), there is statutory bias toward considering the impact of prison overcrowding on the application of the sentencing guidelines.  Recent trends regarding an evidence-based philosophy toward sentencing, encourage the use of sentencing alternatives, including the use of probation.  As of 2015, there were 205,723 prisoners in the Federal Bureau of Prisons, with an overall overcrowding rate of 23 percent.

Should the court conclude that either downward departures, or a variance, or both, from the advisory guidelines system is warranted, a sentence of probation, and other substitutes to imprisonment may include a sentence of time-served, to be followed by an appropriate period of time on supervised release, to include the use of intermediate sanctions such as intermittent confinement, community confinement, or home detention, as provided in subsection (c)(3) of §5C1.1.  Furthermore, if deemed necessary, most United States Probation Offices employ the concept of intensive supervision officers for certain offenders in order to provide an additional level of risk control.  By incorporating these alternatives into the calculus of the sentencing, the statutory factor of punishment can still be achieved on several levels, without the imposition of a sentence of straight imprisonment.

By successfully serving more than 18 months on unsupervised pretrial supervision without incident, Pennington has already demonstrated that he is respectful of the law. Consequently, he is amenable to being supervised by the court. It is anticipated that Pennington's status as a first-time offender, his low level of recidivism, his level of cooperation, and his unique family medical circumstances, would suggest that any of these viable alternatives to imprisonment – including probation -- are warranted in this case.,

## Stakeholders Attitudes toward Sentencing Mitigation

A number of stakeholders in the federal criminal justice system are amenable to the consideration of a wider spectrum of factors that courts should consider at sentencing. In the Sentencing Commission's 2010 survey on the attitudes of United States District Judges, the jurists responded to several questions pertinent to the factors in mitigation in this case. Question 13 involved "Departures and Variances: Factors to Consider at Sentencing."

First, the Commission found that with respect to the issue of family ties and responsibilities, 62 percent of the judges affirmed that this factor is ordinarily relevant to departure and/or variance consideration. Only two percent of the jurists opined that this consideration was never relevant to sentencing. As reflected earlier in this report, Pennington has two very young children; one with delayed speech patterns

health, whose welfare is contingent on sentencing, as well as a father dealing with the medical implications of skin cancer. Pennington has always provided necessary and meticulous support for his children.

Second, with respect to post-offense rehabilitative efforts, the Commission found that 70 percent of the judges opined that this factor is ordinarily relevant to downward departure/variance consideration. Only one percent of the respondents found that this factor is never relevant to a determination at sentencing. In this case, Pennington, although convicted at trial, reached an epiphany about the use of his time pending sentencing, by realizing that he had the ability to help others in the community. As reflected earlier, Pennington has embarked on a mission to assist struggling business owners by volunteering his time at the Beaver Street Enterprise Center in the core city of Jacksonville.  His efforts have been of valuable assistance to the organization, and Pennington has been well-received by the management, staff, and fledgling business owners who are targeted by the program.

Third, although Pennington has been convicted by virtue of his own acts and omissions with respect to the facts of the case, his unique personal relationship with Ms. Keesbury, and Mr. French, strongly suggests that Pennington was influenced by his respect for them, and his veneration of Mr. French as his mentor in business. According to the survey, 68 percent of the judges believe that factor of undue

influence related to affection, relationship, or fear of other offenders, should be ordinarily relevant to departure/variance considerations. The nature and circumstances of the offense reveal that the history and quality of Pennington's relationship with the other two offenders was of a nature that both facilitated his decision to become involved in the behavior leading to his conviction.

Consequently, it is anticipated that these three factors, in combination, are consistent with the opinions by the judicial survey respondents, in a determination of what circumstances that should be factored into the calculus of the sufficiency of a sentence.

In a joint response to the United States Sentencing Commission's request for comment on a proposed amendment to the sentencing guidelines on "First-Offenders/Alternatives to Incarceration," four prominent organizations interested in criminal sentencing, and the administration of justice, offered the following summary:

> The undersigned applaud the Sentencing Commission's consideration of an amendment to increase the availability of sentences of alternatives to incarceration within the federal sentencing guidelines. The Sentencing Reform Act of 1984, which created the guideline system, wisely recognized the appropriateness of non-incarceration sentences in certain cases. Since that time criminological research has underscored Congress's assumptions, and evidence suggests, that a broader cohort of people than at present could be sentenced within the federal system more efficiently without incarceration. Doing so would not compromise

public safety, but would save tax dollars, preserve families and enhance rehabilitation.

The Equal Justice Institute, a nonprofit research and advocacy group headquartered in Montgomery, Alabama, and led by widely acclaimed public interest lawyer, Bryan Stevenson, who works to monitor and redress the effects of excessive punishment in court systems, has articulated the following position:

> More than 2.2 million Americans are imprisoned, most serving excessively long sentences that advance no public safety purpose, and come at great expense to taxpayers. The politics of fear and anger in the 1980s and 1990s led to so-called "tough on crime" sentencing policies that are now being recognized as harsh, counter-productive, discriminatory, and fiscally irresponsible.

Finally, The Sentencing Project, a research and advocacy reform group in Washington, D.C., challenges the futility and inappropriateness of indiscriminate incarceration to achieve the legitimate goals of societal well-being by positing the following view:

> The United States is the world's leader in incarceration, with 2.2 million people currently in the nation's prisons or jails -- a 500 percent increase over the past thirty years. These trends have resulted in prison overcrowding, and state governments being overwhelmed by the burden of funding a rapidly expanding penal system, despite increasing evidence that large-scale incarceration is not the most effective means of achieving public safety.

Accordingly, a wide range of responsible participants agree, that whenever practicable, courts should apply the rule of parsimony, and exercise a bias toward

imposing the least onerous sentence  possible under the law.

## Conclusion

In consideration of the forgoing discussion and analysis, there is ample evidence in mitigation to allow the Court to fashion a sentence either in departure, or at variance, or both, from the advisory guidelines system.  This position is particularly supported by Pennington's status as a true first-time offender and low risk of recidivism, the anomalous loss calculation, the nature of Pennington's family ties and responsibilities, his own physical limitations, his attempt at post offense rehabilitation, and the need to make restitution to the victims. Pennington respectfully requests that the Court utilize this information to impose a sentence that is "sufficient, but not greater than necessary" under the circumstances of this case.

Respectfully submitted,

KENT & McFARLAND

s/William Mallory Kent
William Mallory Kent
Florida Bar No. 0260738
24 North Market Street
Suite 300
Jacksonville, FL 32202
(904) 398-8000
(904) 348-3124 FAX
(904) 662-4419 Cell Phone
kent@williamkent.com
COUNSEL FOR PENNINGTON

## EXHIBIT LIST

A  Donald Pennington (father) - medical records

B  Photos - 1. Wife and children; 2. Justin Pennington family

C  Photos - 1. Daughter; 2. Justin with daughter

D  Photos - 1. Son;  2. Daughter & son

E  Brooks Rehabilitation Pediatric Evaluation of Justin Pennington II (son)

F  Medical records, Justin Pennington, Orthopaedics Assoc. of St. Augustine

G  Letter to Hon. Brian Davis from Rev. Dr. Robert V. Lee III, Fresh Ministries

H  Letter to Hon. Brian Davis from Theresa Johnson, Beaver Street Enterprise Center

I  Character letters - 1. Kimberly Pennington (wife); 2. Donald Pennington (father) ; 3. Mary Beth Pennington (mother); 4. Thomas Jury (father-in-law); 5. Deborah L. Jury (mother-in-law); 6. Carlos Cortez; 7. Ruth Stein; 8. Larry & Shelley Moore; 9. Shelly Wilson; 10. Mike Sobol, East Coast Transportation; 11. Michael P. Trola; 12. Mark Magnani; 13. Tala Howard Reynolds; 14. Stephen Belton

J  Sentencing Commission 2010 survey results

**CERTIFICATE OF SERVICE**

I hereby certify that on November 9, 2017, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice of

electronic filing to the following and all counsel of record:

Mark Devereaux
mark.devereaux@usdoj.gov

 s/William Mallory Kent
William Mallory Kent